UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TINA MARIE WALZ,                       :
                                       :CIVIL ACTION NO. 3:16-CV-1600
          Plaintiff,                   :
                                       :(JUDGE CONABOY)
          v.                           :
                                       :
CAROLYN W. COLVIN,                     :
Acting Commissioner of                 :
Social Security,                       :
                                       :
          Defendant.                   :
                                       :

_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act").  (Doc. 1.)  She alleged disability beginning on April 7, 2011.  (R. 17.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Gerard Langan, concluded in his October 30, 2014, decision that Plaintiff had the severe impairments of degenerative disc disease of the cervical spine, status post lumbar fusion at L4-S1, bilateral carpal tunnel syndrome, and obesity which ALJ Langan concluded did not meet or equal a listing when considered alone or in combination.  (R. 20.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 21-28.)  ALJ Langan therefore found Plaintiff was not disabled from March 19, 2013, the date the application was filed,

through the date of the decision.  (R. 29.)

Plaintiff alleges the ALJ made the following errors: 1) he improperly analyzed the medical opinion evidence; 2) he did not rely on any medical opinion when assessing residual functional capacity; and 3) he failed to order a consultative examination and/or failed to appoint a medical expert.  (Doc. 10 at 9.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for SSI on March 19, 2013.  (R. 17.)  The claim was initially denied on May 15, 2013, and Plaintiff filed a request for a hearing before an ALJ on May 22, 2013.  (*Id.*)

ALJ Langan held a hearing on August 13, 2014, in Wilkes-Barre, Pennsylvania.  (*Id.*)  Plaintiff, who was represented by an attorney, appeared at the hearing as did Vocational Expert ("VE") Nadine Henzes.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on October 30, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 29.)

Plaintiff's request for review of the ALJ's decision was dated December 8, 2014.  (R. 7-12.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on June 7, 2016.  (R. 1-6.)  In doing so, the ALJ's decision became the

decision of the Acting Commissioner.  (R. 1.)

On August 3, 2016, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on October 13, 2016.  (Docs. 8, 9.)  Plaintiff filed her supporting brief on November 7, 2016.  (Doc. 10.)  Defendant filed her brief on December 9, 2016.  (Doc. 11.)  With the filing of Plaintiff's reply brief (Doc. 12) on December 21, 2016, this matter was fully briefed and ripe for disposition.

## B.   *Factual Background*

Plaintiff was born on May 13, 1965, and was forty-seven years old on the date the application was filed.  (R. 28.)  She has a high school education and past relevant work as an inserting machine operator and plastic bag assembler.  (R. 27.)

## 1.   **Impairment Evidence**[1]

Plaintiff alleged disability due to back injury, neck problems, herniated disc, pinched nerves in the back of her left leg and shoulders, and unsuccessful fusion surgery.  (R. 232.)  The referenced surgery was a 2003 lumbar fusion from L4-S1. (*See* R. 27.)

---

[1] The Court focuses on evidence relevant to issues raised in this appeal, with particular attention paid to the time period at issue--March 19, 2013, through October 30, 2014 (R. 29).  Pursuant to the relevant statute, the pertinent review period includes the twelve months preceding March 19, 2013.  42 U.S.C. § 423(d)(1)(A). *See* SSA POMS: DI22505.001, Medical Evidence of Record (MER) Policies.

On March 7, 2012, Plaintiff was seen for follow-up at Summit Pain Medicine.  (R. 300.)  Plaintiff reported that the caudal epidural she received in June 2011 had significantly helped her low back pain.  (*Id.*)  She also reported that she was having muscle spasms, the pain in her back (which ranged from 4-10/10) radiated into her lower extremities bilaterally, she had tingling and bilateral arm numbness as well as weakness (especially in her right arm), and she had fairly frequent severe headaches.  (*Id.*)  Plaintiff said her pain was worst when she had to stand or sit for any prolonged period of time and it was better when she could lie down as long as she could reposition frequently.  (*Id.*)  Physical examination showed the following: Plaintiff had tenderness to palpation in the lumbar spine in the midline and over the paravertebral's bilaterally; she did not have any neurosensory deficits in her lower extremities; straight leg raising was negative bilaterally; her gait was nonantalgic; she had tenderness over cervical facets on the right at C5, C6 and C7; she had minimal tenderness over the cervical facets on the left at the same levels; she had full range of motion of the neck; she had some decreased sensation in her right upper extremity from her elbow to her two smallest fingers on her right hand; and her grip strength was equal bilaterally.  (R. 300-01.)  CRNP Marcia Helfrick assessed chronic low back pain, failed lumbar laminectomy syndrome, lower extremity radicular pain, more recent neck pain, and right upper extremity

4

neurosensory deficits and radicular pain.  (R. 301.)  In addition to prescriptions for Lidoderm patch, Voltaren gel and Tramadol, the plan was to schedule another caudal epidural steroid injection, have an MRI of the spine "due to her new neurosensory deficits," and follow up after her injection.  (*Id.*)

At her May 4, 2012, visit, Plaintiff was seen by Timothy Sempowski, D.O., who recorded Plaintiff said her shot had helped initially (50% relief for one month) but it was starting to wear off.  (R. 302.)  Plaintiff also reported that she recently had an MRI for neck pain but the back pain was worse and she wanted to address that first.  (*Id.*)  Physical examination showed no new findings "that are changed from baseline."  (*Id.*)  Office records indicate the MRI done on March 31, 2012, showed a small broad-based posterior central disc protrusion at C6-7 with superimposed degenerative disc disease and facet degeneration as well as moderate to marked degenerative disc disease at C4-5 and C5-6.  (R. 303.)

In June 2012, Plaintiff reported continuing pain, and repeat injections were planned.  (R. 305.)  Dr. Sempowski noted that if Plaintiff again experienced only temporary benefit, he would recommend evaluation by Dr. Eva Malinowksi to discuss possible dorsal column stimulator trial for treatment of her chronic radiculopathy secondary to postlaminectomy syndrome.  (*Id.*)

In July Plaintiff was seen at Summit Pain Medicine by Dr.

Malinowski.  (R. 307-08.)  Plaintiff reported that her pain was constant and ranged fron 9-10/10 with daily living activites, and she had intermittent weakness and numbness.  (R. 306.)  Physical examination showed that she ambulated "sparing her left lower extremity," her range of motion of the left lumbosacral region was diminished, and she had no significant new changes from the previous examination.  (R. 307.)  The plan was to continue Plaintiff on her current treatment and add Percocet twice daily and a neurotransmitter, Neurontin, three times a day.  (R. 307.)

At her September 2012 visit to Summit Pain Medicine, Plaintiff was seen by Amanpreet Sandhu, M.D.  (R. 308-10.)  She reported worsening neck pain radiating down bilateral upper extremities as well as numbness and weakness of bilateral upper extremities with symptoms worse on the right hand.  (R. 308.)  Plaintiff also said her pain interfered with her sleep, activities of daily living, and social functioning.  (*Id.*)  Physical exam was basically normal except lumbar flexion and extension caused pain.  (R. 309.)  Dr. Sandhu recorded the following plan: possible cervical epidural steroid injection for neck pain and upper extremity numbness and weakness; referral to Wellspan neurosurgery for possible surgical treatment of moderate to severe cervical spinal stenosis; referral to orthopedic surgery for carpal tunnel release; adjust her medication regimen; and for lower back radiating pain repeat injections, medial branch blocks would be considered as well as

6

consideration for radiofrequency ablation in the future.  (R. 310.)
Dr. Sandhu's October plan was similar.  (R. 313.)  He noted that
Plaintiff's low back pain was mostly secondary to failed back
surgery syndrome and lumbar spondylosis.  (*Id.*)  His diagnoses
included spinal stenosis.  (*Id.*)

    In November 2012, Dr. Sandhu noted that Plaintiff had left
lumbosacral medial branch blocks from L3-L5 and had greater than
80% relief of her left-sided low back pain lasting about one day.
(R. 314.)  He added that the neurosurgery clinic had recommended
surgery for cervical stenosis and bilateral upper extremity
numbness and weakness.  (*Id.*)  Despite reports of continuing pain
that interfered with her sleep, activities of daily living and
social functioning, Dr. Sandhu recorded that Plaintiff "noted
significant improvement in her quality of life as well as her
ability to function socially and taking care of her young
daughter."  (*Id.*)  Her phsyical exam showed a normal gait, 2+ deep
tendon reflexes bilaterally in the upper and lower extremities,
single leg raise test negative bilaterally, Faber negative
bilaterally, no SI tenderness bilaterally, no midline or bilateral
tenderness of the lumbosacral spine, lumbar flexion and extension
caused pain, and facet loading was strongly positive bilaterally,
left greater than right.  (R. 315.)  In his plan, Dr. Sandhu
commented "[s]ince the patient has greater than 80% relief of her
left-sided low back pain after her left lumbosacral medial branch

7

blocks we will schedule the patient for left lumbosacral medial radiofrequency ablation for levels above the fusion."  (R. 316.)

In February 2013, Dr. Sandhu noted that Plaintiff had had the radiofrequency ablation since her last visit and reported good relief but she also reported worsening pain and symptoms since then.  (R. 317.)  Dr. Sandhu again noted reports of continuing pain that interfered with sleep, activities of daily living and social functioning, and also recorded that Plaintiff "noted significant improvement in her quality of life as well as her ability to function socially and taking care of her young daughter."  (*Id.*) Physical examination showed the following: sensory soft touch decreased in the left lower extremity; antalgic gait; deep tendon reflexes 1+ bilaterally upper and lower extremities; leg raise negative on the right and positive on the left; Faber strongly positive on the left and mildly positive on the right; left greater than right SI tenderness bilaterally; muscle tenderness of the lumbosacral spine; lumbar flexion and extension caused pain; and facet loading strongly positive on the right and mildly positive on the left.  (R. 318.)  In addition to a review of Plaintiff's medications, Dr. Sandhu provided the following summary of Plaintiff's status:

> Currently the patient has significant
> pain originating in her left lower back and
> buttock and radiating down her left lower
> extremity all the way down to her left foot
> along with left leg weakness and numbness.
> This pain is likely secondary to combination

of sacroiliitis as well as left lumbar
radicuopathy secondary to degenerative disc
disease and postlaminectomy syndrome.  We
will obtain an MRI of her lumbosacral spine
with contrast in order to further elucidate
the etiology of her left lower extremity pain
as well as worsening numbness and weakness.
The patient [may] also be candidate for left
sacroiliac joint steroid injections as well
as left transforaminal epidural injections at
L3 through S1 versus interlaminar ESI.  We
will also refer the patient to neurosurgery
at Wellspan for further evaluation of her
symptoms.  The patient was recommended
surgery for her neck however her left lower
extremity and back symptoms are worse at this
time and she wants to hold off on cervical
surgery for now.

(R. 319.)

Plaintiff had an initial evaluation at The Reading Neck &
Spine Center on June 17, 2013, conducted by Yong Park, M.D.  (R.
402-03.)  He recorded that Plaintiff was self-referred after
previously treating at Summit Pain Management where she had several
epidural injections using multiple approaches, a median branch
block, and a radiofrequency ablation, and she denied relief from
these procedures.  (R. 402.)  Plaintiff rated the intensity of her
radiating back pain as 10/10 and intermittent; she rated her
radiating neck pain as 5-9/10.  (*Id.*)  Examination showed the
following: cervical range of motion 40 degrees rotation to the
right and 30 to the left, full flexion, extension 10 degrees, pain
provoked primarily with bilateral rotation and extension; lumbar
spine flexion of 15 degrees and 0 degrees extension, single leg
raise positive bilaterally, and Patrick's test negative

9

bilaterally; sensory examination diminished on the right from C4 to S1; MMT shows trace weakness in the right upper extremity in all major muscle groups, left side intact; reflexes absent in both the upper and lower extremities and symmetric; and Hoffman's negative. (R. 403.)  Dr. Park's impression was complex pain syndrome.  (*Id.*) He noted that it was difficult to determine where the pain was coming from, the cervical MRI showed multilevel disc protrusions and a small central protrusion in the lumbar spine at L5-S1.  (*Id.*) Dr. Park planned to repeat the upper extremity EMG and renew pain medication prescriptions.  (*Id.*)

The August 29, 2013, Electrodiagnostic Report showed mild chronic right median neuropathy at the wrist but no cervical radiculopathies.  (R. 401.)  Dr. Park renewed Plaintiff's pain medications, prescribed a wrist splint, and scheduled a cervical epidural injection at the C6-7 level.

CRNP Robert Davis of the Neck & Spine Center saw Plaintiff on Novmeber 4, 2013.  (R. 399-400.)  Plaintiff reported 8/10 back pain and 9/10 left leg pain.  (R. 399.)  Examination showed the following: midline tenderness over L4; antalgic gait, wide and unsteady; seated SLR examination positive on left at 60 degrees and negative on right; motor examination 3/5 muscle strength over left hip flexors, left knee flexors and extensors and left ankle flexors and extensors; sensation decreased to light touch over the left lateral thigh, left anterior thigh and left lateral calf; and

expressed hypersensitivity with palpation over left lateral calf. (*Id.*)  The disagnosis was postlaminectomy syndrome with low back pain and lumbar radiculopathy.  (Id.)  The plan was to obtain MRI of the lumbar spine, after which Plaintiff would return to the office to discuss therapeutic options.  (*Id.*)

MRI of the cervical spine performed on July 18, 2014, showed:

> 1.  There has been some development of reactive discogenic endplate signal changes and edema at C6-C7 compared with 3/30/2012. There is a small stable mild posterior central broad-based disc protrusion, superimposed moderate annular bulging and spondylosis changes again resulting in moderate to marked canal stenosis and progression of bilateral neuroforaminal narrowing at this level.
>
> 2.  Stable moderate posterior disc protrusions and slightly progressed spondylosis changes at C4-C5 and C5-C6 resulting in progression of moderate canal stenosis at C4-C5 and moderate to marked canal stenosis C5-C6.  There has been some progression of marked bilateral neuroforaminal narrowing at these levels as well.
>
> 3.  Stable annular bulging with slightly increased spondylosis changes at C3-C4 resulting in slightly progressed mild canal and now bilateral neuroforaminal narrowing at this level.  No other evidence for frank cervical disc herniation, other areas of high-grade canal stenosis or definite acute marrow signal abnormality.
>
> 4.  Stable, unremarkable appearance of the cervical spinal cord.

(R. 408.)

11

## 2.   Opinion Evidence

There is no opinion evidence during the relevant time period. An opinion issued in conjunction with a previous application for benefits by Robert J. Balogh, Jr., M.D., a state agency medical consultant, on July 7, 2011, was reviewed by ALJ Langan in the current decision.  (R. 27.)  After noting that Dr. Balogh opined that Plaintiff retained the residual functional capacity for a full range of light exertional work, ALJ Langan concluded the opinion should be given "some weight" but the evidence as a whole, including that received after the opinion was rendered, supported greater limitations at the light exertional level. (*Id.*)

## 3.   Hearing Testimony

At the hearing held on August 13, 2014, Plaintiff testified that she was unable to work because of pain in her lower back and down her left leg as well as pain in her neck.  (R. 45.)  She noted that doctors discussed fusion surgery for her neck but she had not decided yet whether to have it done.  (R. 45-56.)  Plaintiff added that the neck pain travels to her shoulders, arms and hands, and her hands get numb and she drops things and has a hard time doing things like buttoning.  (R. 46, 48-49.)  Plaintiff also explained that she can only sit or stand for about fifteen minutes at a time because her back, left hip and leg cramp up and she has to change positions.  (R. 46-47.)  When asked if she thought there was any job she could do, Plaintiff responded that she did not think so

because she was unable to stand, could not sit for too long, could not lift things, and could not walk or carry anything.  (R. 58.)

By way of background, Plaintiff said she had back surgery in 2003 and had problems right after the surgery which improved through time but had gotten increasingly worse since 2010.  (R. 53.)  She also said the pain in her neck started in about 2010. (R. 55.)

Plaintiff testified that her only income was child support and she lived with her six-year-old daughter in an apartment subsidized under Section Eight.  (R. 41, 57-58.)

After testifying that a hypothetical individual with Plaintiff's age, education and work experience and certain non-exertional limitations could not perform Plaintiff's past relevant work but could perform other positions, the VE was asked to consider a hypothetical individual with Plaintiff's age, education and work experience who was capable of performing light work with the following limitations: she could never climb ropes, ladders, or scaffolds; she could occasionally climb ramps and stairs; she was capable of no more than occasional use of the left lower extremity for operation of foot controls and pedals; she should avoid concentrated exposure to extreme cold temperatures and wetness; she required the ability to alternate between sitting and standing every thirty minutes; she was capable of no more than occasional use of her bilateral upper extremities for fine manipulation but no

limitation with respect to the use of bilateral upper extremities for gross handling.  (R. 62-63.)  VE Henzes responded that such an individual would be capable of working as an information clerk, a folder, and a tagger.  (R. 64.)

**4.   ALJ Decision**

As noted above, ALJ Langan issued his Decision on October 30, 2014.  (R. 17-29.)  He made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant has not engaged in substantial gainful activity since March 19, 2013, the application date (20 CFR 416.971 et seq.).
>
> 2.   The claimant has the following severe combination of impairments: degenerative disc disease of the cervical spine; status post lumbar fusion at L4-S1; bilateral carpal tunnel syndrome (CTS); and obesity (20 CFR 416.920(c)).
>
> 3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) being further limited as follows: the claimant should avoid concentrated exposure to unprotected heights and moving machinery.  She should never climb ropes, ladders or scaffolds but can occasionally climb ramps and stairs. She may occasionally use the left lower extremity for operation of foot

14

controls.  Claimant should avoid concentrated exposure to extreme cold temperatures and wetness.  Claimant would require the ability to alternate between sitting and standing every 30 minutes.  She may occasionally use the bilateral upper extremities for fine manipulation but has no limitations for gross handling.

5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   The claimant was born on May 13, 1965 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.   Consideration the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since March 19, 2013, the date the application was filed (20 CFR 416.920(g)).

(R. 19-29.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

15

determine whether a claimant is disabled.[2]  It is necessary for the

Commissioner to ascertain: 1) whether the applicant is engaged in a

substantial activity; 2) whether the applicant is severely

impaired; 3) whether the impairment matches or is equal to the

requirements of one of the listed impairments, whereby he qualifies

for benefits without further inquiry; 4) whether the claimant can

perform his past work; 5) whether the claimant's impairment

together with his age, education, and past work experiences

preclude him from doing any other sort of work.  20 C.F.R. §§

404.1520(b)-(g), 416.920(b)-(g); see *Sullivan v. Zebley*, 493 U.S.

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment,

the ALJ makes a finding about the claimant's residual functional

---

[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e).  The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  (R. 28-29.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

18

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ improperly analyzed the medical opinion evidence; 2) the ALJ did not rely on any medical opinion when assessing residual functional capacity; and 3) the ALJ failed to order a consultative examination and/or failed to appoint a medical expert.  (Doc. 10 at 9.)  Plaintiff asks the Court to remand the case with instructions to request a consultative examination and/or obtain additional medical opinions, reassess Plaintiff's RFC, and issue a new decision based on substantial evidence and proper legal standards.  (Doc. 10 at 22.)

Plaintiff's first two alleged errors basically argue the RFC is not supported by substantial evidence and, therefore, the Court will analyze them together.

**A.   *Residual Functional Capacity***

Plaintiff argues that ALJ Langan erred in attributing "some weight" to Dr. Balogh's opinion and improperly did not rely on any medical opinion when assessing Plaintiff's RFC.  (Doc. 10 at 10-19.)  Defendant responds that ALJ Langan reasonably assigned some weight to Dr. Balogh's opinion and he was not required to base his RFC on a medical opinion.  (Doc. 12 at 8-18.)  The Court concludes that ALJ Langan did not provide adequate explanation for his RFC assessment for the Court to determine whether it is based on substantial evidence.

Assuming *arguendo* that the ALJ could attribute "some weight" to a state agency consultant's opinion which was issued almost one year before the relevant time period identified above, that weight should be minimal because the record clearly indicates that Plaintiff's condition worsened after Dr. Balogh issued his opinion. As discussed in *Batdorf v. Colvin*, Civ. A. No. 3:16-CV-409, 2016 WL 4493356, at *9-10 (M.D. Pa. Aug. 26, 2016) (citing *Grimes v. Colvin*, Civ. A. No. 15-113E, 2016 WL 246963, at *2 (W.D. Pa. Jan. 21, 2016)), reliance on an opinion which predates evidence indicating a new or deteriorating condition is problematic.  While ALJ Langan does not explicitly acknowledge deterioration in his

analysis of Dr. Balogh's opinion, he inferentially does so in his recognition that the record "supports greater limitations" than those found by Dr. Balogh.  (R. 27.)  Further, because ALJ Langan does not explain what "some weight" means, the Court cannot meaningfully review his limited analysis and cannot consider the opinion supportive of the ALJ's RFC findings.

This conclusion leads to the question raised with Plaintiff's second claimed error--whether, in the absence of any opinion evidence, the ALJ's RFC ia supported by substantial evidence. Plaintiff avers that an ALJ "cannot speculate as to a claimant's RFC but must have medical evidence, and generally a medical opinion, regarding the functional capabilities of the claimant supporting his determination."  (Doc. 10 at 16 (listing cases).) Defendant responds that the Third Circuit has recognized that "'[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC,'" (Doc. 11 at 12 (quoting *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) (not precedential)), and that "the ALJ is not required to seek a separate medical opinion when assessing the claimant's RFC" (*id.* (citing *Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003) (not precedential)).

*Mays* focused on fundamental requirements regarding an ALJ's RFC assessment: the ALJ's RFC determination must be based on medical evidence in the record, 78 F. App'x at 812 (citing 20

C.F.R. § 404.1545(a)(3)); and the ALJ "must provide 'a clear and satisfactory explication' of the basis on which the determination rests," *id.* (quoting *Cotter*, 642 F.2d at 704).

While the Court agrees that a residual functional capacity assessment need not be based on a medical opinion, *see McCurdy v. Colvin*, Civ. A. No. 3:15-CV-2436, 2016 WL 4077268, at *11 n.3 (M.D. Pa. Aug. 1, 2016), general evidentiary principles and the cases cited by Defendant support the proposition that medical evidence in the record must be sufficient to support the ALJ's determination and the ALJ must adequately explain the basis for the assessment. *Titterington*, 174 F. App'x at 11; *Mays*, 78 F. App'x at 812-13. Importantly, it is beyond the province of an ALJ to engage in speculation and make medical judgments on his own in the absence of record support. *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983) (citing *Gober v. Matthews*, 574 F.2d 772 (3d Cir. 1978); *Schaaf v. Matthews*, 574 F.2d 157 (3d Cir. 1978)).

Before summarizing the evidence of record, ALJ Langan concluded that

> [o]bjective findings on clinical physical examinations and in diagnostic testing and the claimant's own self-reported level of daily functioning fail to confirm the presence of an impairment or combination of impairments which could reasonably be expected to produce the alleged degree of symptomatology and functional limitations or support a finding of complete disability.

(R. 23.)  After summarizing the medical evidence and assigning

23

"some weight" to Dr. Balogh's opinion, the ALJ stated that

> [t]he claimant appeared for a hearing.  She
> described back pain, neck pain and hand
> numbness.  She stood at times during the
> hearing.  She previously underwent a lumbar
> fusion from L4-S1 in 2003. The claimant
> states that she continued to experience low
> back pain.  She has since developed neck
> pain.  The claimant's cervical MRI has
> remained stable and an EMG performed in
> August 2013 showed mild bilateral carpal
> tunnel syndrome but no cervical
> radiculopathy.

(R. 27.)  ALJ Langan then explained his RFC determination as

follows:

> After reviewing all of the evidence, the
> undersigned concludes that the claimant has
> the residual functional capacity to perform
> at a range [of] light exertional work further
> limited as described above.  The above
> residual functional capacity assessment is
> supported by and consistent with objective
> medical evidence including diagnostic testing
> and measurable findings in clinical
> examination.  The claimant's complaints are
> supported somewhat by the objective evidence
> of record, but not to the extent as alleged
> by claimant.  Exertional, postural,
> manipulative, and environmental limitations
> have been included to address the well-
> supported objective deficits of record.  The
> above residual functional capacity is also
> consistent with the claimant's activity level
> as indicated.  The objective evidence does
> not support a finding that the claimant is
> more severely impaired than stated above.  In
> light of the evidence of record, the above
> residual functional capacity gives the
> claimant the benefit of the doubt but still
> does not preclude her from performing other
> work.

(R. 27.)

These excerpts from ALJ Langan's decision illustrate the problem the Court faces in determining whether his RFC is supported by substantial evidence.  First, aside from the general conclusory nature of the assessment, the ALJ's statement that "[t]he claimant's cervical MRI has remained stable" (R. 27) contradicts the record (R. 408) and the ALJ's summary of that evidence (R. 24): as set out in the background section of this Memorandum, the July 2014 cervical MRI was specifically compared with a March 2012 study and numerous changes were noted.  (*See* R. 408.)

Second, absent additional explanation by the ALJ or more direct medical evidence, the Court cannot conclude that the ALJ's determination that Plaintiff "may occasionally use the left lower extremity for operation of foot controls" is consistent with objective evidence that Plaintiff's most recent examinations showed a positive single-leg test on the left (R. 399, 403), absent lower extremity reflexes (R. 403), diminished muscle strength over the left hip flexors, left knee flexors and extensors, and left ankle flexors and extensors (R. 399), and decreased sensation to light touch over the left lateral thigh, left anterior thigh and left lateral calf (*id.*).  Given these objectively verified limitations and the lack of explanation in the ALJ's analysis, the Court cannot conclude a reasonable factfinder would agree with ALJ Langan that Plaintiff could reliably be counted on to use his left lower extremity to operate foot controls up to one-third of the time as

contemplated by the term "occasionally" in the Social Security context, SSR 96-9p, 2016 WL 374185 (July 2, 1996). *Richardson*, 402 U.S. at 401; *Titterington*, 174 F. App'x at 11; *Cotter*, 642 F.2d at 704.

A similar question arises as to whether a reasonable factfinder would find the ALJ's conclusion that Plaintiff could "occasionally use the bilateral upper extremities for fine manipulation but has no limitation for gross handling" (R. 21) (and no additional limitations related to upper extremities) is supported by substantial evidence when objective examination showed cervical spine range of motion of thirty to forty degrees and extension of ten degrees (R. 401, 403)[3], manual muscle testing which at times showed trace weakness in the right upper extremity in all muscle groups (R. 403), reflexes absent or trace in the upper extremities symmetrically (R. 401, 403), and sensory examination diminished on the right from C4 to S1 (R. 403).  As with the ALJ's lower extremity limitations, given the analysis set out in the decision and a review of the evidence of record from a chronological perspective, the Court cannot conclude that this aspect of the RFC is supported by substantial evidence.  In both instances it appears that ALJ Langan engaged in improper

---

[3]  Normal flexion is eighty to ninety degrees, and normal extension is seventy degrees.  http://boneandspine.com/range-cercial-spine.

speculation and made medical judgments on his own in the absence of record support.  *See Kent*, 710 F.2d at 115.

In concluding that remand is warranted for further assessment of Plaintiff's RFC, the Court is cognizant of Plaintiff's duty to develop the record and the lack of evidence highlighted in Defendant's brief (Doc. 11 at 17).  As the Court's review of evidence set out above shows, the record indicates that Plaintiff was seen at the Neck & Spine Center in November 2013 (R. 399-400) and from then until the October 30, 2014, Decision date, the only medical record is the July 2014 cervical MRI report (R. 408).

In considering this evidentiary gap, the Court must keep in mind that, given the remedial nature of the Social Security Act, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence, and "courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed," *Dobrowolsky*, 606 F.2d at 406.  Importantly, the lack of evidence for a certain time period noted by Defendant (Doc. 11 at 17) cannot be deemed supportive of the ALJ's findings because it was not discussed by the ALJ himself.[4]  It is the ALJ's

---

[4]  The Court's review of the record indicates that ALJ Langan did not explore this alleged deficit at the August 13, 2014, hearing or by any other means.  This is significant because an ALJ may only draw inferences related to a claimant's lack of treatment or conservative treatment after he first considers "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular

responsibility to explicitly provide reasons for his decision; analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07. Therefore, gaps in the record before the Court do not alter the conclusion that remand is warranted.

**B.   *Development of the Record***

Plaintiff argues that the ALJ did not adequately develop the record: because "the evidence as a whole" was insufficient, the ALJ was required to order a consultative examination pursuant to 20 C.F.R. § 404.1519a(b) or he could have obtained an updated opinion regarding Plaintiff's RFC pursuant to HALLEX I-2-5-34(A)(2).[5] (Doc. 10 at 21.)  Defendant responds that no further development of the record was necessary because the burden of proof rests with the claimant, not the ALJ.  (Doc. 11 at 19.)  Because the Court has found that remand is required for the reasons outlined above, only

---

medical visits or failure to seek medical treatment."  SSR 96-7p, 1996 WL 374186, at *7-8; *Grissinger v. Colvin*, Civ. A. No. 15-202, 2016 WL 5919937, at *3 (W.D. Pa. Oct. 11, 2016) (listing cases).

[5]  Plaintiff cites HALLEX 1-2-5-34(A)(2) for the proposition that "[a]n ALJ may need to obtain an ME opinion . . . when the ALJ . . . [i]s determining the claimant's residual functional limitations and abilities as established by the medical evidence of record" and notes that "[t]he HALLEX is binding on all adjudicators at all levels of administrative review."  (Doc. 10 at 21 & n.5 (citing SSR 13-2p; quoting HALLEX I-2-5-34(A)(2)).)

limited discussion of this claimed error is warranted.

Although the duty to assist the claimant and develop the record is well established, the duty is not unlimited.  The requirement does not necessarily come into play where "there was sufficient evidence in the medical records for the ALJ to make her decision."  *Moody v. Barnhart*, 114 F. App'x 495, 501 (3d Cir. 2004) (not precedential); *see also Griffin v. Commissioner of Social Security*, 303 F. App'x 886, 890 n.5 (3d Cir. 2009) (not precedential).  If the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered. *See*, *e.g.*, *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

Development of the record may include a consultative examination.  The relevant regulation provides that such an examination may be required in certain situations such as when there is a need to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to allow a determination to be made on the claim.  20 C.F.R. § 404.1519a(b)(4).  By way of example, the regulation states that a consultative examination might be purchased to secure needed medical evidence in the following situations: 1) when additional evidence needed is not contained in the records of the medical sources; 2) evidence that may have been available from medical sources cannot be obtained for reasons beyond the claimant's control; 3) highly specialized or technical evidence is needed and is not available from medical

sources; and 4) there is an indication of a change in the claimant's condition that is likely to affect the ability to work, but the current severity of the claimant's impairment is not established.  20 C.F.R. § 404.1519a(b)(4).

As the discussion in the preceding section of this Memorandum indicates, the ALJ's RFC assessment is deficient.  Because one noted deficiency is that ALJ Langan appears to have engaged in improper speculation and made medical judgments on his own in the absence of record support, this may be a case where more information is required for an adequate determination to be made. Thus, because the record may be inadequate for proper evaluation of Plaintiff's RFC, the ALJ's duty to develop the record is likely triggered in this case and the issue must be addressed upon remand.

### V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge


DATED: February 7, 2017


                              30